UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

TIANNA B.,[1]

Plaintiff,

v.                                                                    Action No. 2:22cv392

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,

Defendant.

UNITED STATES MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Tianna B. ("plaintiff") filed this action for review of a decision by the Commissioner

("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period

of disability and disability insurance benefits ("DIB") and Supplemental Security Income ("SSI")

benefits under Titles II and XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

An order of reference assigned this matter to the undersigned. ECF No. 10. The Court

recommends that plaintiff's motion for summary judgment (ECF No. 12) be **DENIED**, and the

Commissioner's motion for summary judgment (ECF No. 15) be **GRANTED**.

I.      PROCEDURAL BACKGROUND

Plaintiff protectively filed applications for disability and supplemental income benefits on

April 21, 2020, and June 26, 2020, alleging she became disabled on February 29, 2020.  R. 20,

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name
has been redacted for privacy reasons.  Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S.,
Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

140–49, 264–70.[2]  Plaintiff alleges disability from neurological lead poisoning, short-term memory loss, anxiety, bipolar disorder, depression, loss of concentration, rheumatoid arthritis in her back, immunodeficiencies, and hypertension.  R. 298.  Following the state agency's initial and reconsideration denials of her claims, R. 78–88, 91–118, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), R. 165–66.  ALJ Carol Matula held a hearing by video teleconference on October 18, 2021.  R. 38–62.  The ALJ issued a decision denying benefits on October 27, 2021.  R. 17–37.  The Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 6–10.  Therefore, ALJ Matula's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Having exhausted administrative remedies, plaintiff filed a complaint on September 16, 2022.  ECF No. 1.  The Commissioner answered on November 14, 2022.  ECF No. 8.  In response to the Court's order, plaintiff and the Commissioner filed motions for summary judgment, with supporting memoranda, on December 16, 2022, and January 17, 2023, respectively.  ECF Nos. 12–13, 15–16.  Plaintiff replied to the Commissioner's motion on February 7, 2023.  ECF No. 17.  As plaintiff waived oral argument, ECF No. 14, and no special circumstances require oral argument, the case is deemed submitted for a decision.

## II.    RELEVANT FACTUAL BACKGROUND

Plaintiff alleges that the ALJ did not properly evaluate the opinion evidence of the consultative examiner, Michael Fielding, Ph.D., as to plaintiff's intellectual capacity and cognitive functions.  Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 13, at 9–13.  Thus,

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

plaintiff argues, the ALJ failed to support the mental residual functional capacity ("RFC") determination with substantial evidence. *Id.* The Court's review of the facts below is tailored to these arguments.

**A.    *Background Information and Hearing Testimony by Plaintiff***

At the time of the hearing before the ALJ on October 18, 2021, plaintiff was 30 years old and married without children. R. 41–43. Plaintiff lived with a roommate to help with expenses due to her husband's recent incarceration. *Id.* Plaintiff testified that, before her husband's incarceration, they would go to the movies, out to eat, and to the mall. R. 48.

Plaintiff finished tenth grade, and while in school, she had an individualized education plan ("IEP") for special education due to her learning disability. R. 41, 43–44; *see also* R. 609–93 (education records dated 2008 to 2011). Plaintiff was able to read and understand notices from the SSA, although she could not calculate the amount of change at the cash register in a store. R. 44. Plaintiff took a variety of anxiety medications which caused dizziness and drowsiness, and recently started seeing a psychiatrist. R. 46–48. Plaintiff testified that she no longer used alcohol and marijuana. R. 48.

Plaintiff worked as a personal care aide for "a few months" in 2017, providing patients with in-home services such as bathing, feeding, clothing, and cleaning. R. 44–45. Plaintiff had income in 2019, but she did not remember what kind of work she did that year. R. 45. In 2021, plaintiff worked as a cook for two weeks, but had to quit because of physical health issues. R. 49–50. Plaintiff's mother helped her with cooking, cleaning, laundry, and paying bills, although plaintiff could clean her bathroom and vacuum. R. 50–51, 53.

**B.      *Hearing Testimony by Vocational Expert***

Linda Augins, a vocational expert ("VE"), testified at the hearing.  R. 57–62.  VE Augins

determined that plaintiff would be unable to return to her past relevant work as a personal care

aide because it requires medium exertion.  R. 58.  VE Augins testified that someone with the same

age, education, work history, and RFC[3] as plaintiff could perform jobs requiring light work such

as laundry folder, price marker, and office helper.  R. 59.  The VE further testified that there could

be no work in the national economy for someone who needed to be (1) supervised for one-third of

the day; (2) absent more than twice a month; or (3) off-task for between ten and fifteen percent of

the workday.  R. 60–61.

**C.      *Relevant Medical Record***

Because the parties disagree only as to whether substantial evidence supports the ALJ's

mental RFC determination, the Court will limit the discussion to medical records as they pertain

to the plaintiff's mental and cognitive functions.  *See* Pl.'s Mem. 9–13; Def.'s Mem. in Supp. of

Mot. for Summ. J. ("Def.'s Mem."), ECF No. 16, at 16–23.

> **1.      Psychological Consultative Examination Reports from Plaintiff's 2012 Disability Insurance Claim**

Prior to filing the current claim for disability and supplemental income benefits, plaintiff

submitted a disability insurance claim in 2012.  R. 79, 92, 106.  During the benefits determination

process for that filing, Michael Fielding, Ph.D., and Randy Rhoad, Psy.D., each submitted a

psychological consultative examination report, dated December 14, 2012, and July 23, 2014,

respectively.  R. 350–64.

---

[3] The RFC included the following mental limitations: "simple, routine, nonproduction pace tasks" that involve rare changes to work location and procedures, as well as no mathematical skills.  R. 58–59.

a.      **Consultative Examination Report by Michael Fielding, Ph.D.**

On October 13 and December 10, 2012, Dr. Fielding conducted a consultative examination to assess plaintiff's psychological and functional capabilities. R. 350–57. Dr. Fielding reviewed plaintiff's educational records, noting that reading comprehension was identified as an "area of strength" and math computations as "an area of weakness." R. 350–51. Dr. Fielding noted that plaintiff was "not a particularly good listener" and had a limited vocabulary, but was independent in her activities of daily living. R. 351.

Dr. Fielding performed a mental status examination, finding that plaintiff was highly nervous and anxious with a flat affect. R. 353. She was appropriately dressed, cooperative, and compliant. R. 352. Her speech tone and flow were adequate and her thought processes were "logical and organized at a more simple level of understanding cognitively." *Id.* She did not demonstrate delusions, thought disorder, or hallucinations. *Id.*

Dr. Fielding administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"), which yielded a full-scale IQ score of 71.[4] R. 353–56. During the testing, plaintiff was alert with adequate concentration, focus, persistence, and attention, and an excellent attitude. R. 353. She was able to express herself and understand, but not necessarily at an age-appropriate level, was able to maintain conversational speech, and did not require coaching though repetition was needed from time to time. *Id.* She was "unable to retain very much information at any one time" and proceeded at a slow pace. *Id.* Dr. Fielding diagnosed mild mental retardation, depressive

---

[4] In the mental status examination section of his report, Dr. Fielding indicates plaintiff had a "Full Scale IQ Score of 71 [on the WAIS-IV test] placing her within the lower portion of the borderline intellectual range." R. 353. He later states in the test results portion of the report that, on the "Full Scale IQ, she scored at 64 placing her within the mid-range of mild mental retardation. Her GAI [general ability index] was computed to be 71 as her verbal comprehension skills were stronger than her perceptual reasoning skills." R. 355.

disorder, and anxiety disorder, and made a provisional diagnosis of learning disability and attention deficit hyperactivity disorder.  R. 355–56.

As for plaintiff's functional abilities, Dr. Fielding notes that plaintiff had been working 30-hour weeks at a Wendy's fast-food restaurant for over one month, and had worked before in that position for over one year.  R. 356.  Dr. Fielding found plaintiff was "functioning remarkably well given her cognitive ability," "functioning in a competitive work environment . . . at least in a marginal level," "most likely with special and additional supervision given her cognitive level of functioning," and "accepting and carrying out instructions from supervisors well enough to retain employment."  R. 356–57.  Dr. Fielding noted that, in general, plaintiff would be capable of "simple and repetitive jobs," although unable to perform detailed and complex jobs.  *Id.*

### b.      Consultative Examination Report by Randy Rhoad, Psy.D.

On July 22, 2014, Dr. Rhoad conducted a consultative examination as to plaintiff's psychological and cognitive functions.  R. 359–64.  Plaintiff reported that she never completed her GED program and received special education while attending school.  R. 360.  She acknowledged using marijuana "all day every day," to help her "not be so upset."  R. 362.  Recognizing Dr. Fielding's diagnosis of mild mental retardation, Dr. Rhoad reported that plaintiff "present[ed] with relatively deficit cognitive-functioning skills."  R. 361.  A mental status evaluation revealed plaintiff had a moderately restricted affect and mildly to moderately depressed mood.  *Id.*  Yet, Dr. Rhoad noted that plaintiff exhibited normal speech, seemed attentive with intact insight and judgment, and "did not display deficits with concentration skills during the evaluations process." *Id.*  He diagnosed plaintiff with persistent depressive disorder, borderline intellectual functioning and cannabis use disorder.  R. 362.  Dr. Rhoad found plaintiff "may realize improvement with functioning" if she begins a substance-abuse program and stops using marijuana.  *Id.*  Reporting

that plaintiff likely has borderline intellectual functioning skills, Dr. Rhoad concluded that plaintiff is likely capable of doing repetitive and simple job tasks, although she might need a "minimal degree of extra assistance." R. 362–63. Furthermore, Dr. Rhoad stated that plaintiff can "follow[] through" with simple work "on a relatively consistent basis" while accepting instructions from her supervisors. R. 363

### 2. Mental Health Treatment Record

#### a. Bon Secours

Records indicate that from January 2020 to April 2021, plaintiff received primary care through the Bon Secours system. During that period, Taylor Brockman, N.P. ("NP Brockman"), and Sheree Savage-Artis, N.P. ("NP Savage-Artis"), treated plaintiff for various issues, including mental health conditions. R. 519–37, 585–95, 733–77.

##### i. Taylor Brockman, N.P.

On January 22, 2020, approximately one month before her alleged onset date of February 29, 2020, plaintiff presented to NP Brockman at Bon Secours Suffolk Medical Associates as a new patient. R. 531–37. Plaintiff reported working 12-hour shifts for a mental health group home as a personal care assistant. R. 532. NP Brockman noted that plaintiff was nervous/anxious with a dysphoric mood, but was negative for agitation, behavioral problems, confusion, decreased concentration, self-injury, or suicidal ideas. R. 533. NP Brockman diagnosed plaintiff with current major depressive disorder in partial remission, prescribed 25 mg of Zoloft, and directed plaintiff to follow-up in four weeks. R. 536.

On February 19, 2020, plaintiff returned for the follow-up appointment. R. 518–24. Plaintiff stated that she took the prescribed Zoloft only once because the dosage made her feel "like a zombie." R. 519. Plaintiff was nervous, anxious, and agitated with a dysphoric mood. R.

7

520.  NP Brockman encouraged plaintiff to take Zoloft nightly for at least one week while monitoring the side effects, and to follow-up in four weeks. R. 523–24.

On March 19, 2020, after plaintiff's alleged onset date, plaintiff attended the follow-up appointment. R. 513–17. Plaintiff explained that she "gets down but overall [was] okay." R. 514. Plaintiff stated she was not interested in medication "at this point." *Id.* Instead, to feel well, she planned to get plenty of sunshine, eat well, exercise, and read. *Id.* NP Brockman found plaintiff to be alert and fully oriented and did not prescribe medication for mental health, instructing plaintiff to follow-up in six months. R. 516.

On July 9, 2020, plaintiff presented to NP Brockman for a non-mental-health-related condition via synchronous audio-video technology. R. 592–94. During this appointment, plaintiff was found to be negative for depression, and was not nervous or anxious. R. 594. NP Brockman noted that plaintiff exhibited "normal mood, behavior, speech . . . and thought processes," as well as the ability "to follow commands." *Id.*

On July 28, 2020, plaintiff visited NP Brockman and stated that she had recently restarted taking Zoloft for depressive feelings. R. 586–87. While plaintiff's depression screening was positive, she was alert and oriented with a normal mood and behavior. R. 590. NP Brockman prescribed 25 mg of Zoloft with a follow-up appointment in four weeks. R. 590–91.

### ii.   Sheree Savage-Artis, N.P.

On November 11, 2020, plaintiff presented to NP Savage-Artis at Bon Secours Medical Group. R. 733–40. Plaintiff reported that she was taking care of her household chores by herself, and she asked for depression medication other than Zoloft because the drug made her feel like a "[z]o[m]bie." R. 733. Plaintiff was crying during the examination and distressed that she could not get relief from her wrist pain. R. 734. NP Savage-Artis found plaintiff was alert and oriented

with a normal mood and affect. R. 727. She discontinued Zoloft and prescribed Lexapro, with an instruction to follow up in four weeks. R. 733, 738. Plaintiff was also provided with a list of psychologists to contact for psychiatric care. R. 733.

On December 10, 2020, plaintiff returned for a virtual follow-up visit. R. 742–47. NP Savage-Artis noted that plaintiff exhibited normal mood, affect, behavior, speech, thought process, and ability to follow commands. R. 746. She was not nervous, anxious, or depressed. R. 745. Plaintiff reported that she was not yet seeing a psychologist but was waiting to set up an appointment. R. 742. Plaintiff stated that she was "doing well" on Lexapro, and although she still had "bouts of depression," she can control how she feels. R. 743. NP Savage-Artis continued the prescription. *Id.*

On January 12, 2021, plaintiff attended a virtual appointment. R. 749–53. NP Savage-Artis noted that plaintiff was nervous, anxious, and depressed. R. 753. Plaintiff complained that Lexapro was no longer helping her depression, and in response, NP Savage-Artis prescribed Trazodone. R. 750.

On February 5, 2021, during a follow-up visit, plaintiff reported having been approved for medical marijuana. R. 756. NP Savage-Artis noted plaintiff's mood and affect were normal and instructed plaintiff not to use Trazodone once plaintiff started to take the marijuana. R. 756, 760.

On March 10, 2021, plaintiff reported that she was currently taking Trazodone nightly as prescribed. R. 763. Plaintiff's mood and affect were normal. R. 767. NP Savage-Artis told plaintiff to bring the medical marijuana registration card to the next visit to update her chart. R. 763.

On April 13, 2021, plaintiff reported that she was continuing the Trazodone without side effects but was not yet taking the medical marijuana because the dispensary was not providing the

medication. R. 772. Plaintiff reported that she had married in March 2021, but her spouse had recently left to serve a two-year jail sentence causing her to be depressed. *Id.* NP Savage-Artis noted plaintiff had a normal mood and affect. R. 774. She instructed plaintiff to take Trazodone twice daily and prescribed Vitamin D. R. 772.

### b. Tiffany Davis, N.P., Peace of Mind Therapeutic Solutions

On July 28, 2021, plaintiff presented to Tiffany Davis, N.P. ("NP Davis"), at Peace of Mind Therapeutic Solutions, for an initial consultation. R. 904–08. Plaintiff stated that her past mental health medications had not worked, and that she was experiencing anxiety and having suicidal ideations due to her husband's recent incarceration. R. 904. Plaintiff had never seen a mental health provider and had never been hospitalized for psychiatric issues. R. 905. Following an examination, NP Davis noted that, while plaintiff had a depressed, tearful mood, she was attentive and had a cooperative attitude, normal affect, clear speech, clear thought process, lucid thought content, intact memory, normal judgment, good insight, good concentration, and an "average & above" intelligence level. R. 904. NP Davis noted that plaintiff's functioning at work, self-care, sleep, and socialization with others were all normal. *Id.* Upon diagnosing plaintiff with bipolar disorder, generalized anxiety disorder, insomnia, and post-traumatic stress disorder, NP Davis prescribed Wellbutrin and Risperdal. R. 907.

One month later, on August 31, 2021, plaintiff returned for a follow-up visit, complaining that Wellbutrin was not helping with her depression, she was stressed about her finances, and she was waiting for disability. R. 909. NP Davis made the same findings following a mental status evaluation as during the previous visit. R. 912. NP Davis discontinued Wellbutrin and Risperdal, and prescribed Prozac and Restoril and instructed plaintiff to return in three weeks. R. 912–13.

### 3.    State Agency Psychologist Reviews

On May 22, 2020, state agency psychologist Leslie Montgomery, Ph.D., reviewed plaintiff's medical record during the initial review of plaintiff's benefits application. R. 82–88. Dr. Montgomery found that plaintiff had a learning disorder, intellectual disorder, borderline intellectual functioning, anxiety and obsessive-compulsive disorder, and depressive, bipolar, and related disorders. R. 83.

Dr. Montgomery evaluated plaintiff under the criteria for the following listings: 12.04 for depressive, bipolar, and related disorders, 12.06 for anxiety and obsessive-compulsive disorders, and 12.11 for neurodevelopmental disorders. *Id.* Dr. Montgomery concluded that "due to her low IQ [plaintiff] would be able to remember only very familiar locations and very well learned and familiar work-like procedures," and could perform "very familiar or extremely routine procedures." R. 85–86. Dr. Montgomery also found that plaintiff would need assistance in adapting to change, unless infrequent or implemented gradually. R. 86.

On July 31, 2020, state agency psychologist Joseph Leizer, Ph.D., reviewed plaintiff's medical record during the reconsideration-level review. R. 110–16. Dr. Leizer agreed with the findings from the initial review, concluding that plaintiff had the same psychological impairments and resulting limitations. R. 110, 114–16.

### III.    THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[5] the ALJ followed the five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The ALJ considered whether

---

[5] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work considering her RFC; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 21–32.

First, the ALJ found that plaintiff met the insured requirements[6] of the Social Security Act through December 31, 2021, and that she had not engaged in substantial gainful activity from February 29, 2020, her alleged onset date of disability, through the date of the decision. R. 23.

At steps two and three, the ALJ found that plaintiff had the following severe mental impairments: (1) borderline intellectual functioning, (2) persistent depressive disorder, and (3) severe cannabis use disorder. *Id.* The ALJ found plaintiff's physical impairments including hypertension, herpes simplex, and headaches to be non-severe because their symptoms did not result in significant functional limitations and they remained stable with medication. R. 23–24. The ALJ determined that plaintiff's severe mental impairments, considered singly and in combination, failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for a finding of disability at step three. R. 25–26.

The ALJ next found that plaintiff possessed the RFC to perform light work, *see* 20 C.F.R. §§ 404.1567(b), 416.967(b), subject to certain physical and environmental limitations.

---

continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

[6] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

R. 26–27.  The ALJ determined that plaintiff can perform "simple, routine, nonproduction pace tasks" that involve rare changes to work location and procedures, as well as no mathematical skills. R. 26–30.

At step four, the ALJ found that plaintiff could not perform her past relevant work as a personal care aide.  R. 30.  Finally, at step five, the ALJ considered plaintiff's age, education, work experience, and mental RFC, as well as the VE's testimony, to find that plaintiff could perform other jobs in the national economy such as price marker, office helper, envelope addresser, telephone information clerk, and document preparer.  R. 30–31.  Accordingly, the ALJ found that plaintiff was ineligible for benefits as she was not disabled from February 29, 2020, through the date of the decision, October 27, 2021.  R. 31–32.

## IV.   STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Johnson,*

434 F. 3d at 653. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Thus, reversing the denial of benefits is appropriate only if either (a) the record is devoid of substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *Id.*

## V.   ANALYSIS

Plaintiff seeks a remand arguing that the ALJ's mental RFC determination is unsupported by substantial evidence because the ALJ failed to articulate the supportability and consistency of Dr. Fielding's 2012 opinion, as required by the regulations. Pl.'s Mem. 9–13 (citing 20 C.F.R. §§ 416.920c(b)(2), (c)(1)–(2)). Plaintiff argues that Dr. Fielding's opinion is "highly supported by his examination findings," and that the opinion is consistent with the record. *Id.* at 11–12.

The Commissioner argues that the ALJ did not err in assessing Dr. Fielding's opinion because she sufficiently explained the grounds for finding that the medical opinion was "generally unpersuasive." Def.'s Mem. 16–23. The Commissioner emphasizes that a proper assessment of medical records requires only "reasonable articulation" that allows the reviewing court to follow the ALJ's reasoning, and that specific regulatory terms of "supportability" and "consistency" need not be used. *Id.* at 18–19 (citing 82 Fed. Reg. 5844, at 5858 (Jan. 18, 2017)). The Commissioner argues that the ALJ properly found Dr. Fielding's opinion to be temporally remote and unpersuasive, and properly considered plaintiff's treatment notes and work history that contradicted Dr. Fielding's findings. *Id.* at 19–21.

### A.     The ALJ properly evaluated Dr. Fielding's medical opinion.

Having reviewed the entire record, the ALJ determined that Dr. Fielding's 2012 opinion was "generally unpersuasive" given its remoteness.[7] R. 29. Relying on more recent examination notes, treatment records, and work history, the ALJ found that plaintiff has mild or moderate limitations due to her mental health impairments, thus providing for "simple, unskilled nonproduction paced work." R. 29–30.

In finding Dr. Fielding's opinion generally unpersuasive, the ALJ cited the record and provided adequate explanation for her determination. R. 25, 29. The ALJ first noted that Dr. Fielding's consultative examination report was "dated" and "remote" because the examination was performed in 2012, over seven years before plaintiff's alleged onset date in 2020. R. 25, 29. Courts in the Fourth Circuit have found no error in ALJ decisions deeming medical opinions predating the alleged onset date to be of limited relevance. *Rashard J. v. Saul*, No. 4:19cv123, 2020 WL 8835643, at *7 (E.D. Va. Dec. 10, 2020), *report and recommendation adopted*, 2021 WL 935505 (E.D. Va. Mar. 10, 2021) (agreeing with the ALJ's finding that a medical opinion was unpersuasive because it predated the alleged onset date by almost four years); *Dubose v. Kijakazi*, No. 4:21-CV-03688-TER, 2023 WL 1960997, at *5 (D.S.C. Feb. 13, 2023) (finding no outcome determinative error where the ALJ did not consider a medical opinion predating the alleged onset date by seven months); *Pickett v. Kijakazi*, No. 2:20cv36, 2022 WL 683641, at *8 (W.D. Va. Mar. 8, 2022) (finding an opinion dated two years before the amended onset date was too remote to be

---

[7] Under the new rules applicable to source opinions for claims filed on or after March 27, 2017, medical opinions, whether or not they are from a treating physician, are assessed for persuasiveness. 20 C.F.R. §§ 404.1520c(b), 416.920c(b); *see* 82 Fed. Reg. 5844, at 5854 (noting that the new rules "focus more on the content of medical opinions and less on weighing treating relationships against each other").

relevant); *Simons v. Comm'r, Soc. Sec.*, No. CV RDB-17-1837, 2018 WL 3416943, at *2 (D. Md. July 13, 2018), *report and recommendation adopted*, 2018 WL 4863629 (D. Md. Aug. 1, 2018) (holding the ALJ was not required to discuss a treating source's medical opinion that predated the alleged onset date by almost one year because it had limited relevance); *Gullace v. Astrue*, No. 1:11cv755, 2012 WL 691554, at *24 (E.D. Va. Feb. 13, 2012), *report and recommendation adopted*, 2012 WL 688488 (E.D. Va. Mar. 2, 2012) (holding ALJ need not consider opinions that predated the onset date by one and two years).

As for supportability,[8] the ALJ acknowledged that, while the 2012 IQ testing was dated, the resulting score was "indicative of [plaintiff's] mental capacity." R. 25. Finding this portion of the opinion persuasive, the ALJ accepted plaintiff's borderline intellectual functioning and limited her to performing "simple, routine, nonproduction pace tasks, with rare changes in work location and procedures, and jobs that do not require math." R. 23, 26.

As for consistency[9] with the record, the ALJ referred to plaintiff's work history and financial records showing that plaintiff maintained "substantial gainful activity levels" at various jobs after Dr. Fielding's examinations. R. 25 (citing R. 271–72 (earnings record showing plaintiff's income from 2017 to 2019)). The ALJ also discussed other medical examination notes in the record that did not align with Dr. Fielding's findings. R. 25 ("[E]xamination notes [from a mental health provider] showed [plaintiff] with good IQ in the average and above range." (citing R. 904–17)). The ALJ appropriately referenced this discussion later when she explained why Dr.

---

[8] Supportability is an internal review that requires an ALJ to consider how "objective medical evidence and supporting explanations presented by a medical source . . . support his or her medical opinions." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[9] Consistency is an external review that requires an ALJ to determine how "consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources . . . ." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

Fielding's opinions were not persuasive. R. 29 (finding Dr. Fielding's opinion about plaintiff's limitations in understanding, remembering, and applying instructions to be unpersuasive "given the recent examination notes and work history").[10]

Plaintiff further argues that the ALJ erred when evaluating Dr. Fielding's opinion because the ALJ "afforded persuasiveness to the opinions of [a doctor who performed a physical consultative examination], and Dr. Rhoad which were rendered in 2014," and was "obligated to also evaluate the opinion of Dr. Fielding." Pl.'s Mem. 10. On the contrary, the ALJ found that all three opinions were dated and "generally unpersuasive." R. 29. The ALJ stated, "there are a few remote consultative opinions that the undersigned finds generally unpersuasive given the timeframes," and then discusses Dr. Fielding's, Dr. Rhoad's, and the physical consultative examiner's opinions. *Id.* The ALJ later noted that Dr. Rhoad's opinion was "fairly consistent" with more recent treatment records in certain respects. *Id.* (discussing the finding that plaintiff was capable of simple repetitive work).

The ALJ adequately articulated the grounds for finding Dr. Fielding's opinion unpersuasive by explaining that it was of limited utility due to its dated nature and inconsistent with more recent medical and non-medical records. R. 25, 29. Although the ALJ did not directly reference the regulatory terms "supportability" or "consistency" to justify her persuasiveness determination, she need not have done so as the rationale was reasonably articulated to allow the Court to follow her line of reasoning. *See Todd A. v. Kijakazi*, No. 3:20cv594, 2021 WL 5348668,

---

[10] The ALJ need not repeat pertinent findings multiple times throughout a ruling to support individual conclusions. See McCartney v. Apfel, 28 F. App'x 277, 279 (4th Cir. 2002) (noting "the ALJ need only review medical evidence once in his decision"); Kiernan v. Astrue, No. 3:12cv459, 2013 WL 2323125, at *5 (E.D. Va. May 28, 2013) (observing that, where an "ALJ analyzes a claimant's medical evidence in one part of his decision, there is no requirement that he rehash that discussion" in other parts of the analysis).

at \*4 (E.D. Va. Nov. 16, 2021) ("[E]ven under the new regulatory scheme, the ALJ need not necessarily use the words 'supportability' or 'consistency,' as long as the ALJ still performs the requisite analysis of these factors."); 82 Fed. Reg. 5844, at 5858 (Jan. 18, 2017) (explaining that the SSA's rule for considering medical opinions requires only that the persuasiveness determination "allow a . . . reviewing court to trace the path of an adjudicator's reasoning").

**B.      *Substantial evidence in the record supports the ALJ's decision.***

The ALJ's decision is well-supported by the medical and non-medical records in this case, including plaintiff's work history, treatment records, and the opinions of the two state agency physicians. R. 27–30. Specifically, the ALJ supported her decision with evidence from plaintiff's primary care providers, NP Brockman and NP Savage-Artis, who made mostly normal mental health findings during the relevant period and treated plaintiff's mental health impairments with medication. R. 25, 27, 516, 590, 594, 733, 745–46, 750, 760, 767, 774.

The ALJ also cited the findings of the only treating mental health professional in the record, NP Davis, who treated plaintiff in July and August 2021. R. 28. The ALJ noted that, while NP Davis found that plaintiff's mood was depressed and treated her with medications, she also found that plaintiff's affect was normal, she was cooperative, pleasant, and attentive, with an average to above average IQ, good memory, and concentration, normal behavior, clear speech, clear thought processes, and concrete and lucid thought content. R. 28 (citing 904–09).

The ALJ also considered the state agency psychological consultants' opinions concluding that plaintiff suffers only mild to moderate limitations because of borderline intellectual functioning, depression, and anxiety disorders. R. 30. Lastly, the ALJ's decision is supported by plaintiff's history of working at various jobs at the substantial gainful activity levels. R. 25 (citing R. 271–72). Accordingly, substantial evidence supports the ALJ's determination that plaintiff's

mental health impairments were not disabling, she remained able to perform a limited range of light work as stated in the RFC, and she possessed the capability to successfully adjust to other available work.

## VI.   RECOMMENDATION

For these reasons, the Court recommends that plaintiff's motion for summary judgment (ECF No. 12) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 15) be **GRANTED**.

## VII.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve on the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court

based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
April 26, 2023